# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **TIMMY GARCIA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 3:14-CV-4204-L (BH)** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated February 17, 2015, this case has been transferred for all further proceedings and entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED in part** and **REVERSED in part,** and the case is **REMANDED** for reconsideration.

## I. BACKGROUND

### A. Procedural History

Timmy Garcia (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act.[1] Plaintiff initially applied for DIB, alleging disability beginning on November 12, 2001, due to epilepsy and hemophilia. (R. at 114, 119.)

His application was approved on October 16, 2002 and he was found disabled as November

---

[1] The background information is summarized from the record of the administrative proceedings, which is designated as "R."

12, 2001[2], based on the finding that he had an impairment that met or medically equaled listing 11.03 of 20 C.P.R. Part 404, Subpart P, Appendix 1.[3] (*See* R. at 68.)  On February 28, 2008, the Social Security Administration (SSA) sent Plaintiff a Notice of Disability Cessation, informing him that it had decided that his health had improved, that he was able to work as of February 2008 and was therefore not disabled, and that his disability benefits would cease.  (R. at 92.)  Plaintiff filed a request for reconsideration on April 4, 2008.  (R. at 91.)  He appeared and testified at a hearing before a disability hearing officer on April 15, 2009.  (R. at 66-67.)  On June 10, 2009, the hearing officer issued his decision finding that Plaintiff was not disabled and affirming the previous cessation decision.  (R. at 70-74.)

Plaintiff appealed the hearing officer's decision and requested a hearing before an Administrative Law Judge (ALJ), and he personally appeared and testified at a hearing on March 10, 2010.  (R. at 56, 879-905.)  On August 10, 2010, the ALJ issued her decision finding that Plaintiff's disability ended as of April 1, 2009.  (R. at 11-18.)  He requested review of the ALJ's decision, and the Appeals Council denied his request for review on July 21, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)  Plaintiff appealed the Commissioner's decision  under 42 U.S.C. § 405(g) to the United States District Court for the Northern District of

---

[2]The prior file regarding Plaintiff's application for disability, including the October 16, 2002 decision approving his application for disability benefits and finding him disabled as of November 12, 2001, is not in the current record.  The record does contain documents concerning the Social Security Administration's subsequent decision to terminate benefits that reference and explain the October 16, 2002 decision, however.  (*See* R. at 68, 95.) Those documents also reference the specific medical records used by the Social Security Administration in making its decision, and those medical records are also contained in the record.  (*See id.*)

[3]Listing 11.03 states: Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Texas, alleging that the ALJ's decision lacked substantial evidence due to errors in her decision. (*See* R. at 942.)  The Court remanded the case to the ALJ for further proceedings.  (*See* R. at 941.)

Upon remand, Plaintiff personally appeared and testified at a hearing before the ALJ on January 22, 2013.  (R. at 1586-1600.)  On March 1, 2013, the ALJ issued her second decision finding that Plaintiff's disability ended as of February 1, 2008.  (R. at 930-940.)  He requested review of the ALJ's second decision, and the Appeals Council denied his request for review on November 14, 2014, making the ALJ's second decision the final decision of the Commissioner.  (R. at 906-907, 924.)  Plaintiff timely appealed the Commissioner's second decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on December 11, 1966, and he was 46 years old at the time of the January 22, 2013 hearing before the ALJ.  (R. at 1597.)  He had a high school education and past relevant work as a security guard and a greeter.  (R. at 194,1597.)

### 2.    Medical, Psychological and Psychiatric Evidence

On February 26, 2001, Plaintiff presented to Dr. Paul C. Van Ness, M.D., at the University of Texas Southwestern Medical Center (UT Southwestern) for evaluation of seizures.  (R. at 194.) Dr. Van Ness noted that Plaintiff began to have seizures when he was 18 months old, after a fall on his head that caused a hematoma.  (*Id*.) It was later determined that he had hemophilia with factor 8 deficiency.  (*Id*.)  He currently had complex partial seizures that started with a worried feeling in the pit of his stomach.  (*Id*.) Plaintiff was alert, oriented, and had normal speech, language, and

memory. (*Id.*)  Dr. Van Ness diagnosed him with complex partial seizures and added Keppra to his medication regimen. (R. at 195.)   He noted that Plaintiff was a high school graduate with two years of college. (R. at 194.)

On February 25, 2002, Plaintiff underwent a neuropsychological evaluation by Dr. Richard Hughes, Ph.D., pursuant to a referral from the Texas Rehabilitation Commission.  (R. at 178.) Plaintiff had a verbal IQ of 88, a performance IQ of 89, and a full scale IQ of 88. (R. at 180.)  His achievement in reading and spelling fell above full scale cognitive functioning, but his math was well below expectations.  (*Id.*)  His vocational assets were in the average range for reading and spelling ability, and his vocational limitations were a poorly-controlled seizure disorder, limited access to transportation, a self-reported diagnosis of hemophilia, and a limited range of marketable skills. (R. at 184.)  Dr. Hughes diagnosed him with a mathematics disorder, a seizure disorder, and hemophilia, and he assigned him a Global Assessment of Functioning (GAF)[4] score of 70.  (R. at 185.)

On March 14, 2002, Stephen Carter, a vocational rehabilitation consultant, performed a two-day vocational evaluation of Plaintiff.  (R. at 165-177.)  Plaintiff had a verbal IQ of 91, a performance IQ of 75, and a full scale IQ of 81.  (R. at 169.)  Mr. Carter found that he was functioning within the range usually associated with the semi-skilled to skilled range of community-based employment. (R. at 166.)

Plaintiff experienced 5 to 6 seizures from May 10, 2002 until May 17, 2002, during a

---

[4]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning.  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV-TR) p. 34 (4th ed., rev.2000). A GAF score of 61 to 70 indicates a "mild" impairment in social, occupational, or school functioning.  *Id.*

hospital admission at Parkland Memorial Hospital (Parkland) for consideration of surgery due to seizures.  (R. at 407-408.)  He had a brief 2 to 5 second period of confusion after each seizure.  (R. at 408.)  At admission, he described his seizures as an aura[5] with a tight feeling in his stomach.  (R. at 407.)  He estimated an average of 10 complex partial seizures a month, which varied from 2 per month to 6 in one day.  (*Id.*)  His last seizure was a month prior.  (*Id.*)  His principal diagnoses were listed as right temporal lobe epilepsy and hemophilia.  (R. at 407.)

On July 29, 2002, Dr. Herbert L. Leiman, M.D., performed a physical consultative examination.  (R. at 186.)  Dr. Leiman diagnosed Plaintiff with poorly responsive partial complex seizures, encephalopathy, and factor 8 deficiency hemophilia.  (R. at 187.)

On August 1, 2002, Dr. Ismael Khatai, M.D., noted that Plaintiff experienced 8 complex partial seizures per month.  (R. at 190.)

On August 29, 2002, Dr. S. Spoor, M.D., an SAMC, found that Plaintiff had a seizure disorder that equaled physical listing 11.03.  (R. at 196.)

On January 17, 2003, Plaintiff underwent a right-sided temporal lobectomy in order to lessen the number of seizures he experienced.  (R. at 1220, *see* R. at 399.)  On April 2, 2003, he underwent a left frontal craniotomy for evacuation of a subdural hematoma.  (R. at 399.)  He had been doing well following the January 2003 surgery, until he began to have increasing headaches and lethargy just a few days prior.  (*Id.*)  A CT scan revealed a hematoma on the left frontal area.  (*Id.*)  The doctors thought it was best to remove the subdural hematoma surgically.  (*Id.*)

On April 5, 2005, Plaintiff presented to the emergency department at Parkland requesting

---

[5]An aura is an unusual sensation that may precede a temporal lobe seizure, acting as a warning.  Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/temporal-lobe-seizure/basics/symptoms/con-20022892 (last visited Mar. 28, 2016).  It is actually a simple partial or focal seizure that does not impair consciousness.

"factor eight" due to bleeding and swelling.  (R. at 537.)  He was placed on bedrest and assessed with "hermarthrosis, unspecified" and hemophilia A.  (*Id*.)

Plaintiff underwent psychotherapy with Dr. Dale General, Ph.D., from April 21, 2006 until October 18, 2006.  (R. at 199.)  Dr. General noted that Plaintiff had been seizure-free since his April 2003 surgery.  (R. at 200.)  He also noted a past medical history of hepatitis C, frequent headaches, obesity, and erectile dysfunction.  (*Id*.)  Upon discharge, Dr. General assessed him with depressive disorder, NOS; cognitive disorder, NOS; and a history of hemophilia, seizure disorder, and hepatitis C.  (R. at 201.)  He also assigned him a GAF of 65.  (*Id*.)

On June 13, 2006, Plaintiff underwent another neuropsychological evaluation with Laura H. Lacritz, Ph.D.  (R. at 465.)  She found that Plaintiff demonstrated overall below average to average intellectual abilities, with a verbal IQ of 100, a performance IQ of 80, and a full scale IQ of 91.  (R. at 466.)  He performed within the average range on word reading and spelling, but his arithmetic skills were mildly impaired.  (*Id*.)

On or about June 19, 2007, that Plaintiff presented to the emergency department at Parkland due to swelling, pain, and a reduced range of motion.  (R. at 715.)  He also reported doing heavy lifting at work for 3 days prior to being admitted.  (*Id*.)  He was negative for neurological symptoms. (R. at 711.)

On February 18, 2008, Dr. Barbara Fletcher, Psy.D, performed a psychological consultative examination.  (R. at 202.)  She noted that Plaintiff currently worked at Walmart as a greeter.  (R. at 203.)  He scored a verbal IQ of 88, a performance IQ of 81, and a full scale IQ of 84 on the Wechsler Adult Intelligence Scale (WAIS)-III.  (R. at 205.)  Dr. Fletcher diagnosed him with "major depressive disorder, single episode" and moderate mathematics disorder.  (R. at 206.)  She also

assessed him with a GAF of 55.  (*Id.*)

On February 25, 2008, Dr. Margaret Meyer, M.D., a SAMC, completed an advisory Mental Residual Functional Capacity (RFC) Assessment. (R. at 207-209.)  She found Plaintiff not "significantly limited" to "moderately limited" in various aspects of understanding and memory and sustained concentration and persistence as well as various aspects of social interaction and adaptation.  (R. at 207-208.)  He could understand, remember, and carry out detailed but noncomplex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting.  (R. at 209.)  Her assessment was later affirmed by Dr. Caren Phelan, Ph.D.  (*Id.*)

Dr. Meyer also completed a Psychiatric Review Technique (PRT) form for Plaintiff on February 26, 2008.  (R. at 224.)  She found that Plaintiff had medically determinable impairments of a mathematics disorder and major depressive disorder (single episode, moderate) that did not precisely satisfy the requirements of an organic mental disorder under the listings in section 12.02 of 20 C.P.R. Part 404, Subpart P, Appendix 1, and for an affective disorder under section 12.04 of the listings, respectively. (R. at 211-214.)  She noted that Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. at 221.)  Dr. Phelan confirmed the PRT.  (R. at 211.)

On February 26, 2008, Dr. Kim Rowlands, M.D., a SAMC, completed an advisory physical RFC assessment for Plaintiff.  (R. at 225-232.)  She noted a primary diagnosis of epilepsy and a secondary diagnosis of hemophilia.  (R. at 225.)  She found no exertional, postural, manipulative, visual, or communicative limitations. (R. at 226-229.)  She did find, however, that Plaintiff should

take precautions regarding environmental factors and hazards due to his history of epilepsy and hemophilia. (R. at 229.) He had to avoid unprotected heights, open flames, and moving and open machinery. (*Id*.) She noted that Plaintiff had not had seizures since 2000, and he had a diagnosis of hemophilia. (*Id*.) She also noted that he did chores, took the bus, walked, and rode his bike. (*Id*.) She found that he should be able to perform tasks that did not require exposure to dangerous machinery. (*Id*.) Finally, she found that the alleged limitations were not fully supported by the medical evidence. (*Id*.) Dr. John H. Durfor, M.D., another SAMC, reaffirmed Dr. Rowland's physical RFC assessment on May 8, 2008. (R. at 232.)

On March 5, 2008, Plaintiff's treating doctor, Cynthia Rutherford, M.D., noted that Plaintiff's 2003 right-sided temporal lobectomy did result in a decrease in seizures, but he still had to take epilepsy medication daily and was still bothered by poor eye-hand coordination, balance difficulties, and migraine headaches. (R. at 464.) She found that his medical issues precluded his ability to manage full-time or physically strenuous employment. (*Id*.) On March 24, 2008, Dr. Rutherford noted that Plaintiff needed to lose weight, especially for his joints. (R. at 678.)

On September 5, 2008, Plaintiff reported to a staff member at Parkland that he had not had seizures since 2003. (R. at 666.) He also reported that he walked 2 miles, swam, and biked everyday. (*Id*.)

On April 6, 2009, Plaintiff presented to Parkland. (R. at 640.) He reported that he felt well except for pain on the "balls of his feet." (*Id*.) He reported being seizure-free since his surgery in April 2003. (*Id*.) He was diagnosed with moderate hemophilia A. (R. at 641.) There was no evidence of bleeding or bruising. (*Id*.) On July 22, 2009, Plaintiff reported to a nurse at Parkland that he had increased auras and was out of medication. (R. at 651.)

On July 28, 2009, Dr. Stephen Figueroa completed a Statement of Claimant or Other Person for the SSA.  (R. at 57-58.)  He wrote that Plaintiff had a diagnosis of temporal lobe epilepsy, and was status post anterior temporal lobectomy in January 2003, completed by post-operative subdural hemorrhage.  (R. at 57.)  He wrote that Plaintiff continued to have complex partial seizures that limited his working ability, and he had complex medical problems that required close follow-up. (*Id.*)  Finally, he noted that Plaintiff had restrictions on driving and tasks he could do at work.  (*Id.*)

On July 28, 2009, Plaintiff's mother reported to a doctor at Parkland that Plaintiff continued to have episodes of altered awareness where he was not aware of himself.  (R. at 648.)  The episodes were "stereotyped" and more frequent when he was off of his anti-epileptic medication.  (*Id.*)  He had been off of his medication for 4 months.  (R. at 647.)  Plaintiff also reported that he had lost his disability and medicare, and he was found to have depression and anxiety.  (*Id.*)

On July 29, 2009, Dr. Rutherford wrote a Request for Resumption of Disability Benefits to the SSA.  (R. at 461-462.)  She wrote that Plaintiff suffered from hemophilia A, hepatitis C, and epilepsy.  (R. at 461.)  She found that Plaintiff remained unable to obtain a driver's license, and he still suffered from poor eye-hand coordination, balance difficulties, migraine headaches, reasoning and judgment limitations, and impulse control issues.  (*Id.*)  She noted that Plaintiff's physical and mental disabilities were chronic, life long, and permanent.  (*Id.*)  She opined that there would never be a time when Plaintiff was "cured" or even well enough to survive without comprehensive coordinated hematological and neurological care.  (*Id.*)

On March 25, 2010, Plaintiff presented to Parkland for a follow-up visit.  (R. at 731.)  He had short-term memory difficulty and complained of frequent headaches.  (R. at 732.)  He was assessed with right temporal lobe epilepsy, headache, and memory difficulty.  (R. at 734.)

9

On April 12, 2010, Dr. Rutherford noted that Plaintiff had a history of right knee joint bleed, but a review of symptoms was otherwise negative "times 14 systems." (R. at 822.) Plaintiff reported that he had issues with his job and was somewhat depressed about that. (*Id.*)

Plaintiff underwent an electroencephalograph (EEG) on April 30, 2010. (R. at 605.) In the section of his EEG report describing his history, it was noted that he "started having episodes of confusion and feeling 'out of sorts' lasting three to five minutes, usually every other day." (R. at 819.) The study did not reveal evidence of a current seizure. (*Id.*)

On August 9, 2010, Plaintiff returned to Parkland for a follow-up visit regarding his seizures. (R. at 784.) It was noted that he had continued seizures, but no recent "generalized tonic clonic seizures." (*Id.*)

Plaintiff received a colonoscopy on August 12, 2010. (R. at 799.) It was noted that he had a history of controlled seizures. (*Id.*) It was also noted that he used marijuana. (R. at 798.)

On January 1, 2012, Plaintiff presented to Parkland. (R. at 1580.) He reported being seizure-free after his surgeries until 2010. (*Id.*) It was noted that at his visit in November 2011, he reported being seizure free for 2 months. (*Id.*) Since his last visit, he had seizures about 2 to 3 times a week, due to increased stress at home. (*Id.*) He weighed 357 pounds and exhibited slow gait, but his coordination was "intact to finger-to-nose." (R. at 1582.) His seizure medication was increased, and he was advised to avoid activities such as climbing ladders, operating heavy/moving machinery, swimming alone, etc., due to his seizures. (*Id.*)

On March 16, 2012, Plaintiff presented to Dallas Metrocare Services (Metrocare) for a Psychiatric Diagnostic Interview Exam. (R. at 1045.) He reported that he wanted to continue his treatment and was unable to afford his medication. (R. at 1046.) He had been diagnosed with

bipolar disorder, and his medications had been controlling his symptoms effectively.  (*Id*.)  He was cooperative, euthymic, and with normal thought processes.  (*Id*.)

He returned to Metrocare on April 16, 2012, for a routine follow-up examination.  (R. at 1042.)  He reported that he took his medications daily as prescribed, and they were effective in controlling his symptoms.  (*Id.*)  He denied being depressed or sad.  (*Id*.)  He reported that he did not wear his continuous positive airway pressure (CPAP) at night, which he used to treat his obstructive sleep apnea.  (R. at 1567.)

On June 11, 2012, Plaintiff presented to Metrocare complaining that he was a little depressed, but not sad.  (R. at 1036.)  It was noted that he had "excessive worry," but he also was euthymic, cooperative, and had fair judgment and insight.  (R. at 1037.)  He reported on August 10, 2012, that he had issues getting his disability back and dealing with strict parents and siblings.  (R. at 1032.)  He was also not sleeping well due to his CPAP, but he was eating better and had started walking more.  (*Id*.)   On a scale of 1 to 10, his symptom severity was rated at a 3 and his overall functioning was rated as a 7.  (*Id*.)

On August 16, 2012, Plaintiff presented to Parkland for an established patient visit.  (R. at 1525.)  He reported that he had 2-3 seizures a week in January 2012.  (*Id*.)  Since he increased his medication, however, he had only been having 1 aura a week, which was usually prompted by an argument at home.  (*Id*.)  His bipolar disorder was under control with his medication.  (*Id*.)  It was noted that he was exercising and eating healthier, and his mood was better.  (*Id*.)

On October 6, 2012, he told his clinician at Metrocare that he was stable.  (R. at 1324.)  On November 30, 2012, his symptom severity was rated at a 3, with 0 being no symptoms and 10 being extreme symptoms.  (R. at 1328.)  His functioning was rated at a 7, with 0 being low and a 10 being

high.  (*Id*.)  He reported hearing voices of people talking to him.  (R. at 1329.)  He showed no sign of psychotic features, however, and his thought processes were organized.  (*Id*.)  He did report that he suffered from frequent migraines, for which he took acetaminophen.  (R. at 1519.)

Plaintiff was admitted to Parkland on December 17, 2012, due to right flank/back pain as a result of a fall.  (R. at 1496.)  He had a rib fracture and mild upper abdomen tenderness, but there was no point tenderness in his spine, and no evidence of any bleeding despite his hemophilia.  (*Id*., R. at 1523.)  He denied dizziness, numbness, loss of function, headaches, and seizures. (R. at 1506, 1517.)  He was referred for occupational therapy.  (R. at 1509.)

Plaintiff was "doing ok" on December 28, 2012, when he presented to Metrocare.  (R. at 1334.)

On February 20, 2013, Plaintiff underwent a Medical Assessment of Ability To Do Work-Related Activities (Mental) at Metrocare.  (R. at 917.)  The psychiatrist found that Plaintiff had no significant loss, some loss, or substantial loss of ability to perform various activities in understanding and carrying out instructions; sustained concentration and persistence; responding appropriately to supervision, co-workers and usual work situations; and adapting to changes in a routine work setting.  (R. at 917, 918.)  She assigned him a GAF score of 60 and diagnosed bipolar II disorder.  (R. at 918.)

### 3.      Prior Proceedings

On February 28, 2008, the SSA notified Plaintiff that he was found to no longer be disabled and his benefits would cease.  (R. at 92.)  The Explanation of Determination for the February 2008 decision stated that he was found disabled because of intractable epilepsy and that the SSA conducted the review because it was possible that his health would improve.  (R. at 68.)  It explained

that medical reports showed that surgery was performed, he was able to carry out daily activities most of the time, and the evidence did not show any other health problems that caused significant limitations.  (*Id.*)  Although his condition was severe, records showed that his health did improve, and his improvement increased his ability to work.  (*Id.*)  The Explanation of Determination also specified the information that was used when the SSA last reviewed Plaintiff's case - specifically, records acquired in 2002 from Dr. P. Van Ness, UT Southwestern, Parkland, and Dr. Leiman.  (*Id.*)

Following the SSA's hearing officer's denial of Plaintiff's request for reconsideration of his disability cessation, the SSA issued an Analysis of Evidence and Findings of Fact.  (R. at 68.)  The Analysis noted that Plaintiff was first found to be disabled on October 16, 2002, with an established onset date of November 11, 2001, because his impairment met the severity of Listing 11.03.  (*Id.*)  It also noted that as of October 16, 2002, Plaintiff had been diagnosed as having epilepsy.  (*Id.*)  The epilepsy was not well-controlled, and he was experiencing frequent seizures despite taking anti-convulsive medications for his condition as prescribed.  (*Id.*)  He would have to undergo brain surgery in the future to control the seizures due to the severity of his epilepsy.  (*Id.*)

As noted, Plaintiff appealed the hearing officer's decision and appeared at a hearing on March 10, 2010, before an ALJ.  (R. at 879-905.)  The ALJ found that Plaintiff's disability ended on April 1, 2009, and the Appeals Council denied his request for review.  (R. at 11-18, 1-3.)  Plaintiff appealed that decision to the U.S. District Court for the Northern District of Texas, and the case was remanded to the ALJ for further proceedings based on issues not relevant to the issue raised in this case.  (R. at 941-942.)

### 4.    Hearing Testimony from January 22, 2013

On January 22, 2013, Plaintiff and a VE testified at a hearing before the ALJ.  (R. at 1586-

1600.)  Plaintiff was represented by an attorney.  (R. at 1586.)

### a.       Plaintiff's Testimony

Plaintiff testified that he weighed 360 pounds and was 5 feet, 3 inches tall.  (R. at 1589.)  He

was 46 years old.  (R. at 1597.)  Since 2010, he had had non-convulsive seizures 3 to 4 times a day.

(R. at 1589-1590.) Each seizure lasted about a minute and a half.  (R. at 1590.)  His medications had

been adjusted during that time, but it had not helped.  (*Id*.)  He claimed that his weight had also

increased since 2008, due to a food addiction he developed when his benefits were terminated and

he began to have problems at work.  (*Id.*)

He typically got migraines after his seizures, and he usually had to lie down and recover for

"two, three, maybe 30 minutes" after each seizure.  (R. at 1591.)

He typically spent his day at home.  (*Id*.)  He walked to a park and helped his family out with

day to day chores.  (*Id*.)  He also volunteered at a church every Sunday morning.  (*Id*.)  He did,

however, lay flat on his back most of the day due to water retention in his legs.  (R. at 1592.)  If

water built up and his legs were not raised, he would have trouble breathing.  (*Id*.)

He had sleep apnea, and the doctor talked to him about reducing his weight to improve his

medical condition.  (*Id*.)  He also started to walk more when the weather permitted.  (R. at 1592.)

Plaintiff claimed he cut fried foods out of his diet and ate more soups, homemade stews, and

vegetables.  (*Id*.)  He measured the amount of food he ate, and he probably ate about 200 calories

a day or 3 meals.  (R. at 1593.)  When the ALJ noted that 3 meals a day was 600 calories, Plaintiff

admitted that he was not measuring the amount of calories but was trying to "guess on small

portions."  (R. at 1593-1594.)  He did not know the actual amount.  (R. at 1594.)

Plaintiff had fallen into a hole on his property on December 15, 2012.  (*Id*.)  He fractured his

rear rib and bruised a rib in his upper right quadrant.  (R. at 1595.)  His injuries were expected to

last at least 12 months.  (*Id.*)  Due to his hemophilia, it took longer for his wounds to heal.  (*Id.*)

He was unable to drive.  (*Id.*)  He could stand for about 5 minutes before having to stop and

rest, and he could sit for 30 minutes without having to change positions or do something else.  (*Id.*)

He claimed these limitations were due to his size.  (*Id.*)  He could lift 15, maybe 20 pounds, but he

was not supposed to lift anything or reach above his head because of his rib fracture.  (R. at 1596.)

Plaintiff's last job was as a greeter at Walmart.  (*Id.*)  Before that, he worked for Champion

Security as an unarmed security patrol.  (*Id.*)  He used a golf cart to patrol.  (*Id.*)

### b.     VE's Testimony

The VE classified Plaintiff's past relevant work as a security guard (DOT[6] 372.667-034,

light, SVP:3) and a greeter (DOT 352.667-010, light, SVP:3).  (*Id.*)

The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education,

and work background could perform his past relevant work if he could lift/carry 20 pounds

maximum; could stand/walk for 2 out of 8 hours; could sit for 6 out of 8 hours with a change of

position for 2 minutes every 30 minutes; could occasionally climb ramps or stairs; could not climb

ladders, ropes, or scaffolds; could not balance or crouch; could occasionally stoop, kneel, or crawl;

could not work near hazards including unprotected heights, open flames, and moving machinery

parts; could not drive; needed to avoid temperature extremes or foot handling; and could retain the

ability for 1 to 2 step instructions with a maximum reasoning, math, and language of 211.[7]  (R. at

---

[6]The DOT means the Dictionary of Occupational Titles.

[7]This means a reasoning development of 2, mathematical development of 1, and language development of 1
(RML 2-1-1).  Appendix C of the DOT states that a reasoning development of 2 refers to the ability to apply
commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems
involving a few concrete variables in or from standardized situations. Dept. of Labor, Dictionary of Occupational

1597-1598.) According to the VE, the "weights and the standing" would prevent the individual from

performing Plaintiff's past work.  (R. at 1598.)

There were, however, other jobs that the hypothetical individual could perform, such as an

order clerk (DOT 209.567-014, sedentary, SVP:2), with 1,500 jobs in Texas and 26, 300 nationally;

an addresser (DOT 209.587-010, sedentary, SVP:2), with 1,200 jobs in Texas and 24,060 nationally;

and a production worker, such as a final assembler (DOT 713.687-018, sedentary, SVP:2), with

6,400 jobs in Texas and 106,000 nationally.  (*Id*.)  The tolerance for absenteeism was 1 to 2 days

per month.  (*Id*.)

Plaintiff's attorney modified the hypothetical to include the limitation that the individual was

occasionally unable to maintain concentration, persistence, or pace.  (*Id*.)  The VE testified that if

the individual could not maintain employment for up to one third of the day, then he would not be

able to sustain employment.  (R. at 1599.)

### 5.      The ALJ's March 1, 2013 Decision

The ALJ issued her second decision finding that Plaintiff's disability ended as of February

1, 2008. (R. at 930-940.)  She noted that the most recent favorable medical decision finding Plaintiff

disabled was the determination dated October 16, 2002, which was the comparison point date

(CPD).[8]   (R. at 932.)   She also noted that at the time of the CPD, Plaintiff had epilepsy as a

---

Titles, Appendix C.III (4th ed. 1991). A mathematical development of 1 refers to the ability to add and subtract two
digit numbers; multiply and divide by 10's and 100's by 2, 3, 4, 5; perform four basic arithmetic operations with
coins as part of a dollar; and perform operations with units such as cup, pint, quart, inch, foot, yard, ounce, and
pound. *Id*. Language development of 1 refers to the ability to recognize the meaning of 2,500 words; read at a rate of
95–120 words per minute; compare similarities and differences between words and between series of numbers; print
simple sentences containing subject, verb, object, and series of numbers, names, and addresses; and speak simple
sentences using normal word order, and present and past tenses.  *Id*.

[8]The ALJ actually wrote the date as October 16, 2012.  (*See* R. at 932.)  The date listed in the Analysis of
Evidence and Findings of Fact issued by the SSA following the hearing officer's decision on Plaintiff's cessation of
benefits was October 16, 2002.  (*See* R. at 75.)  The Commissioner's response contends that the ALJ's notation of

medically determinable impairment which was found to medically equal section 11.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).  (*Id.*)  She analyzed Plaintiff's claim pursuant to the 8-step sequential evaluation process outlined in 20 C.F.R. § 404.1594(f)(1)-(8) for determining whether disability benefits should be terminated.  (*Id.*)

At step one, she found that Plaintiff had not engaged in substantial gainful activity between 2008 and 2009.  (*Id.*)  She noted that he had 8 severe medical impairments: morbid obesity, hemophilia, a seizure disorder, a math disorder, depression, sleep apnea, hypertension, and hepatitis. (*Id.*)  At step two, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of an impairments in the Listings.  (*Id.*) She determined at step three that medical improvement occurred as of February 1, 2008.  (R. at 933.) At step four, the ALJ found that the medical improvement was related to the ability to work because as of February 1, 2008, Plaintiff's "CPD impairment no longer met or medically equaled the same listing(s) that was equaled at the time of the CPD (20 CFR 404.1594(c)(3)(I))."  (*Id.*)  This finding dictated a skip to step six. *See* C.F.R. § 404.1594(f)(4).  She determined at step six that as of February 1, 2008, Plaintiff continued to have severe impairments.  (R. at 934.)  Based on the impairments present as of February 1, 2008, the ALJ found at step seven that Plaintiff had the RFC to lift/carry 10 pounds; stand/walk 2 hours in an 8-hour workday; sit 6 hours in an 8-hour workday, with change of positions 2 minutes every 30 minutes; occasionally climb ramps or stairs; could not climb ladders, ropes, and scaffolds; could not balance or crouch; occasionally stoop, kneel, or crawl; could not work with hazards, such as unprotected heights, open flames, or moving machinery parts; could not drive a vehicle; must avoid temperature extreme or  food handling; limited to 1 to 2 step

---

October 16, 2012, was a typographical error.  (*See* doc. 21 at 5, fn. 3.)

17

instructions; could retain the reasoning, mathematics, and language skills to perform work with understanding; could carry out detailed but uninvolved written or oral instructions; could deal with problems involving a few concrete variables in or from standardized situations encountered on the job; could perform basic arithmetic operations; and could read, write, and speak in simple sentences using normal work order (RML 2-1-1). (*Id*.) The ALJ also determined at step seven that Plaintiff was unable to perform his past relevant work. (R. at 939.) At step eight, the ALJ determined that Plaintiff could perform other jobs that existed in significant number in the national economy. (*Id*.) Therefore, the ALJ concluded that Plaintiff's disability ended as of February 1, 2008. (R. at 940.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the

Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Decisions in both areas may be considered in reviewing an ALJ's decision. *See id.* at 436 and n.1.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be

19

disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

###      3.      Termination of Disability Benefits

Once a claimant qualifies for disability benefits and has received those benefits for a period

of time, the SSA is required to review his case periodically to determine whether his previous disability status continues or should end. 20 C.F.R. § 404.1594(a); *Ames III v. Astrue*, No. 2:10-cv-0244, 2012 WL 931346, at *4 (N.D.Tex. Mar. 13, 2012), *rec. adopted*, 2012 WL 946671 (N.D.Tex. Mar. 19, 2012). If the claimant's condition has improved, his eligibility to receive disability benefits may terminate. *See Jones v. Shalala*, 10 F.3d 522, 524 (7th Cir. 1993)(citing 42 U.S.C. § 423(f)).

While the Commissioner utilizes a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act, she utilizes an eight-step sequential process for determining whether disability benefits should be terminated:

1. Is the claimant engaged in substantial gainful activity? If so, the disability has ended.

2. If the disability has not ended, does the claimant have an impairment or combination of impairments that meets or medically equals the severity of an "impairment listing in appendix 1"? If so, the disability continues.

3. If the claimant does not have a listed impairment, has there been a medical improvement? If so, see step 4. If not, see step 5.

4. Is the claimant's medical improvement related to his ability to do work? If not, see step 5. If so, see step 6.

5. Does any exception to medical improvement apply? If one of the exceptions under 20 C.F.R. § 404.1594(d) applies, see step 6. If one of the exceptions under 20 C.F.R. § 404.1594(e) applies, the disability has ended.

6. Are all of the claimant's current impairments in combination severe? If so, see step 7. If no, the disability has ended.

7. Can the claimant do his past work? If so, the disability has ended.

8. Can the claimant perform other work? If so, the disability has ended. If not, the disability continues.

*See* 20 C.F.R.§ 404. 1594(f).  In a disability termination case, the Commissioner bears the burden

of proof at all stages.   *See Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).   The

Commissioner must prove that the disability has ended and that the claimant is no longer disabled.

*Id.*

**B.**   **Issues for Review**

Plaintiff presents four issues for review:

1.  The ALJ's determination that Garcia's disability ceased is legally impermissible under *20 CFR 404.1594(c)(v)* and *20 CFR 404.1594(f)(3)*, because the prior file was lost and not reconstructed and no exception to the medical improvement standard applies.

2.  The ALJ's finding of medical improvement is not based on substantial evidence and is invalid under *20 CFR 404.1594(c)(1)*.

3.  The ALJ erred by not considering the subsection *20 CFR 404.1527* factors before declining to give weight to the opinions of claimant's treating specialist.[9]

4.  The Appeals Council failed to considered new and material evidence of Plaintiff's disability, specifically, the medical source statement of the Plaintiff's treating doctors, pursuant to *20 CFR 404.1527.*

(doc. 20 at 1.)

**C.**   **Reconstruction of Prior File**

Plaintiff contends that the ALJ's determination that his disability ceased is impermissible

because the prior file was lost and not reconstructed.  (doc. 20 at 10.)  As noted, the prior file

regarding Plaintiff's application for disability, including the October 16, 2002 decision approving

his application for disability benefits and finding him disabled as of November 12, 2001, is not in

the current record.

According to the regulations, if the prior file regarding the most recent favorable medical

---

[9]Although Plaintiff did not brief it as a separate issue, he also argues that the ALJ had a duty to re-contact Dr. Rutherford before rejecting her opinions.  (doc. 20 at 16.)

decision cannot be located, the SSA will first decide whether the claimant is able to now engage in substantial gainful activity based on all of his current impairments.  20 C.F.R.§ 404.1594(c)(3)(v).  If the claimant cannot engage in substantial gainful activity, the claimant's benefits will continue unless an exception under 20 C.F.R. § 404.1594(e) applies.  *Id.*  If the claimant is able to engage in substantial gainful activity, however, the SSA "will determine whether an attempt should be made to reconstruct the portions of the missing file that were relevant to [its] most recent favorable medical decision (e.g., work history, medical evidence from treating sources and the results of consultative examinations)."  *Id.*  This determination is guided by the potential availability of old records in light of their age, whether the source of the records or evidence is still in operation, and whether reconstruction efforts will yield a complete record of the basis for the most recent favorable decision.  *Id.*  If relevant portions of that prior record are not reconstructed because it is determined not to attempt to reconstruct or because efforts to reconstruct failed, medical improvement cannot be found.  *Id.*

Here, Plaintiff contends that the prior favorable medical decision granting him disability benefits is not in the file.  (doc. 20 at 10.)  He argues that without a fully favorable medical decision that shows the basis for the Commissioner's decision to award benefits, there is no way of identifying the medical evidence that served as a basis for the favorable decision.  (*Id.*)  Also, the ALJ cannot be sure that the medical file is complete, or determine the exact bases for the prior decision and the impairments that were previously found to be disabling.  (*Id.* at 11.)  Plaintiff argues that the ALJ's failure to address the lack of a favorable decision in the file prevents a finding of medical improvement in this case.  (*Id.*)  The Commissioner responds that the original determination containing the information regarding the impairment upon which the favorable

decision was based is contained in the current file, and that the medical evidence upon which the decision was based is in the transcript.  (doc. 21 at 5.)

Here, because the prior file was missing and the ALJ found that Plaintiff engaged in substantial gainful activity (*see* R. at 932), she was required to determine whether an attempt should be made to reconstruct portions of the missing file that were relevant to the October 16, 2002 decision.  *See* 20 C.F.R.§ 404.1594(c)(3)(v).  She failed to expressly make that determination in her March 1, 2013 decision as required; her decision does not discuss the fact that the prior file is missing from the record.  (*See* R. at  930-940.)

Despite the failure to make a determination regarding whether the prior file should be reconstructed, the error was harmless, and Plaintiff has not shown prejudice.  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F.Supp.2d 811 (E.D.Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  As noted, the Explanation of Determination associated with the SSA's February 28, 2008 determination that Plaintiff's disability had ended outlined the evidence that it used when it last reviewed the case and gave the favorable decision. (R. at 95.)  It specifically identified records received from Dr. Van Ness, UT Southwestern, Parkland, and Dr. Leiman, all of which were in the current record.  (R. at 95.)  The Explanation of Determination also stated that Plaintiff was found disabled because of his intractable epilepsy.  (*Id.*) Additionally, the Analysis of Evidence and Findings of Fact from the hearing officer's June 10, 2009 decision outlined the basis for the SSA's October 16, 2002 decision, i.e., that Plaintiff's impairment was of the severity to medically equal Listing 11.03.  (R. at 68.)   It was also noted that at the time of the October 2002 decision, Plaintiff's epilepsy was not well controlled, and he was experiencing

frequent seizures despite taking anti-convulsive medications for his condition as prescribed.  (*Id.*)
Additionally, he would have to undergo brain surgery in the future to control his seizures due to the
severity of the epilepsy.  (*Id.*)

The relevant portions of the prior file, such as the medical evidence from treating sources
and the results of Dr. Leiman's consultative examination, are in the current record.  Additionally,
the basis for the prior favorable medical decision was outlined by the SSA and became part of the
current record.  Because the date of the prior medical decision, the exact bases for the prior medical
decision, the impairments the prior decision found to be disabling, and the medical evidence
supporting the prior decision are all contained in the current record, it is inconceivable that the
ALJ's finding of medical improvement would have been different had she made a determination
regarding reconstructing relevant portions of the file.  *Compare Fleming v. Sullivan*, 806 F.Supp.13,
15 (E.D.NY. 1992)(finding the record did not support a finding that the plaintiff's medical condition
had improved where there was insufficient evidence of the plaintiff's medical condition from the
date of the prior favorable medical condition); *Castaneda v. Commission of Soc. Sec.*, No. 10-13724,
2011 WL 7299839, at *9 (E.D. Mich. Dec. 7, 2011) (finding the Commissioner would be unable to
show that the plaintiff experienced a medical improvement without sufficient medical  files for the
period in question where only a few medical records from the relevant period could be found).

**D.**     **Medical Improvement Finding**

Plaintiff contends that the ALJ's medical improvement finding is not based on substantial
evidence and is invalid under 20 C.F.R. §  404.1594(c)(1).  (doc. 20 at 12.)

In determining whether a claimant's disability benefits continue after a recent favorable
decision, the Commissioner must determine whether substantial evidence supports a finding of

medical improvement in the claimant's impairments, and if so, whether this medical improvement is related to the claimant's ability to work.  20 C.F.R. § 404.1594(c)(1); *see also* 42. U.S.C. 423(f); *Griego v. Sullivan*, 940 F.2d 942, 943-44 (5th Cir. 1991).  She must also determine that the claimant is now able to engage in substantial gainful activity.  *Hallaron v. Colvin*, 578 F. App'x 350, 353 (5th Cir. 2004).  Medical improvement is shown by "any decrease in the medical severity" of the impairments that were present at the time of the most recent finding of disability or continued disability.  20 C.F.R.§ 404.1594(c)(1).  It is "determined by a comparison of prior and current medical evidence which must show that there have been changes (improvements) in the symptoms, signs, or laboratory changes associated with that impairment(s)."  *Id.*  If medical improvement is shown such that a listed impairment originally found no longer meets the same listed impairment and is no longer a severe impairment, then the medical improvement is related to a claimant's ability to work.  *Id.* at § 404.1594(c)(3)(I).

Plaintiff argues that the ALJ's decision does not discuss records going back to 2002, and therefore she did not compare his prior favorable medical evidence with his current medical evidence.  (doc. 20 at 13-14.)  He also contends that although the Commissioner "makes much of the fact" that he was seizure-free for many years, no doctor has stated that he does not still meet Listing 11.03, or that his epilepsy has improved.  (*Id.* at 13-14.)  Therefore, he contends that the only basis for the ALJ's determination of medical improvement is her own expertise.  (*Id.* at 14.)  The Commissioner responds that the ALJ cites to medical evidence supporting her finding that Plaintiff's seizures do not occur with the frequency alleged.  (doc. 21 at 7.)

Here, the ALJ noted that the most favorable medical decision finding Plaintiff disabled was on October 16, 2002.  (*See* R. at 932.)  She next noted that at the time of that decision, he had the

medically determinable impairment of epilepsy, which medically equaled section 11.03 of the Listings. (*Id.*) After finding that he engaged in substantial gainful activity between 2008 and 2009, and had several "severe" impairments including epilepsy as of February 1, 2008, she found that he did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. (*Id.*) She failed to explain, however, why Plaintiff's epilepsy no longer met or medically equaled Listing 11.03. (*See id.*) She then found that medical improvement occurred as of February 1, 2008. (R. at 933.) She noted that the medical evidence supported a finding that there had been a decrease in the medical severity of his seizure disorder as of February 1, 2008, and that on July 8, 2008, Plaintiff acknowledged that he had been seizure-free since January 2003. (*Id.*)

The ALJ noted in her discussion regarding Plaintiff's RFC that on July 8, 2008, Plaintiff reported being seizure-free since January 2003, and that he engaged in daily activities such as bicycle riding and swimming that are "contraindicated by seizure activity." (*See* R. at 934-939.) Although his mother reported increased auras in a July 2009 examination, they were stereotypical and more frequent when he was off his seizure medications, so the ALJ found that Plaintiff experienced a brief period of exacerbation. (*Id.*) The ALJ also referenced notes between April 12, 2010 and October 5, 2012, that contradicted his hearing testimony by indicating that his auras stabilized with medication, because exacerbated symptoms were typically not reported. (*Id.*) Plaintiff had also described his seizures as controlled on August 12, 2010. (*Id.*) The ALJ noted that Plaintiff reported episodes of confusion and "feeling out of sorts" for 3 to 5 minutes during the April 2010 EEG, but the EEG revealed no evidence of current seizure activity. (*Id.*)

The ALJ found that these facts suggested that despite marijuana use, Plaintiff's seizures

generally remained well controlled through 2012. (*Id*.) Also, they raised questions as to the frequency of seizure activity alleged. (*Id*.) The ALJ stated that the evidence suggested that 4 months before his first hearing, Plaintiff's symptoms had stabilized. (*Id*.) She also found that with the exception of a progress note from his neurologist that noted Plaintiff reported being seizure-free for the prior 2 months in November 2011, there was no evidence that he pursued or required medical care for seizure activity between April 2010 and January 2012. (R. at 936.) She acknowledged that at a January 12, 2012 evaluation, Plaintiff reported seizure activity 2 to 3 times per week due to increased stress at home. (*Id*.) She found, however, that with adjustments made to his prescribed medication regime, he reported having 1 aura per week on August 16, 2012, usually prompted by an argument at home. (*Id*.) She noted that as recently as December 12, 2012, he specifically denied problems with headaches and seizure activity. (*Id*.)

She also found that Plaintiff's statements regarding the frequency of his seizures and his other symptoms were not credible. (R. at 935.) In reaching this conclusion, she considered Plaintiff's lack of candor regarding his diet during the January 22, 2013 hearing. (*Id*.) The ALJ found that at most, the evidence and the functional limitations imposed by treating sources who advised Plaintiff to avoid climbing ladders or operating heavy machinery established the need for seizure precautions in the workplace. (*Id*.)

Although the ALJ referenced the October 16, 2002 decision, she did not refer at all to any of the records supporting that decision. She did not compare the prior evidence with the current evidence in order to show that medical improvement did occur. As part of the 8-step analysis, she was required to compare Plaintiff's symptoms from October 2002 with those after February 1, 2008, "with precise explanations of any changes between the state of the impairment when Plaintiff met

the Listing and the subsequent state of impairment." *Jones v. Colvin*, No. H-13-1221, 2014 WL 3827819, at *10 (N.D.Tex. July 31, 2014).  Although it is clear that she did consider the fact that Plaintiff previously suffered from seizures in noting that he reported having no seizures since 2002, "[s]ubstantial evidence to support a finding of medical improvement would seem to require at least a brief discussion of the specifics of plaintiff's original impairment and current evidence of the medical severity of that impairment." *See Ames*, 2012 WL 931346, at *10.  The ALJ contends that Plaintiff's seizures were well-controlled once they reoccurred in 2009 and 2010; however, she has not made clear how that level of control compared with the level of control before the 2003 surgery.

Additionally, the ALJ failed to articulate her reasoning for finding that Plaintiff's epilepsy no longer met or medically equaled section 11.03 of the Listings.  (*See* R. at 932.)  Other than noting that he acknowledged he had been seizure-free since January 2003, she also did not articulate her reasoning for finding that medical improvement occurred as of February 1, 2008.  (*Id.*)

Further, although the ALJ appears to rely heavily on the fact that Plaintiff was seizure-free after 2003, the record establishes that he began to have auras and seizures again in 2009.  Despite the ALJ's conclusion that Plaintiff's auras and reoccurrence of seizures after 2009 were typically tied to noncompliance and were well-controlled based on his reports to his doctors, it is also not clear from the record how well-controlled the seizures were, given his allegations that they kept occurring and his need for medication adjustment.  Importantly, there is no medical opinion after 2009 stating that Plaintiff's epilepsy was improved since the 2003 surgery, that his epilepsy was well-controlled, or that his functional limitations were improved.  The only medical opinion in the record in 2009 or later is from Dr. Rutherford, who stated that Plaintiff suffered from poor eye-hand coordination, balance difficulties, migraine headaches, reasoning and judgment limitations, and

impulse control issues, which does not suggest any improvement.  (*See* R. at 461.)  The ALJ gave

limited weight to her opinion due to the fact that Plaintiff previously reported being seizure-free

between January 2003 and January 2010.  (*See* R. at 936.)  At the time of Dr. Rutherford's opinion,

however, Plaintiff had begun experiencing auras, and one doctor noted prior to Dr. Rutherford's

opinion that Plaintiff continued to have complex seizures.  (*See* R. at 57.)  Also, a decrease in

seizures at that time did not necessarily preclude the limitations Dr. Rutherford provided.  There is

also no objective medical evidence after 2009 regarding Plaintiff's epilepsy, except for the EEG in

April 2010.  (*See* R. at 605.)  While the EEG indicated that there was no current seizure activity, that

was simply a measure of current activity, as opposed to recent or ongoing activity.

    Given the lack of any testimony or opinions from physicians or experts or any objective

medical evidence after 2009 showing that Plaintiff's epilepsy became decreased in severity such that

he medically improved, the ALJ's decision is not supported by substantial evidence of medical

improvement.[10]  *See Garza v. Astrue,* No. 3:11-cv-3545-G-BN, 2013 WL 796727, at *6 (N.D. Tex.

Feb. 7, 2013)(remanding case where the ALJ based his decision with respect to medical

improvement on a select few medical records without any testimony or opinion physicians or

experts).  As noted in *Ames*:

> It is difficult to see how "medical improvement" of an impairment can be evaluated,
> much less how any such improvement's relation to the claimant's ability to work can
> be determined, if there is no objective medical evidence nor any medical assessment
> showing the listed impairment to no longer meet or medically equal the listing based
> on actual changes shown by the medical evidence.  Consequently, while the non-

---

[10]There is a physical RFC assessment in the record from a SAMC noting that Plaintiff only had
environmental limitations due to his epilepsy.  (R. at 225-232.)  The assessment was made in early 2008 (and was
reaffirmed in May 2008) before he began experiencing auras and seizures again, and the SAMC relied on the fact
that he experienced no seizures since 2000.  (*See* R. at 232.)  Moreover, the ALJ did not rely on the assessment in
making her finding, and Plaintiff's treating physician gave a medical opinion only a month later noting that despite
the decrease in seizures, he still experienced coordination and balance difficulties.  (*See* doc. 464.)

> medical evidence in the form of plaintiff's testimony might indicate an increase in his functional capacity and possibly his ability to work, the lack of any medical evidence whatsoever concerning his impairment previously held to be disabling would appear to preclude a finding of medical improvement sufficient to terminate benefits.  Consequently, while it is possible that plaintiff's impairment may have decreased in medical severity, such decrease is *not* documented by any medical findings.

2013 WL 796727, at *6 (emphasis in original).  Given that any possible decrease in the severity of Plaintiff's impairment is not well documented by objective medical evidence or medical opinions, the case is remanded so the ALJ can take steps to ensure a complete record and to conduct a full analysis as to the medical improvement finding.[11]  *See id.,* at *9 (finding the ALJ should take steps to ensure that a complete record is made); *Jones*, 2013 WL  796727, at *6 (same).

## E.  <u>Treating Physician Rule</u>

Plaintiff next contends that the ALJ rejected the medical source statements of Dr. Rutherford and Dr. Figueroa without considering the six factors set forth in  20 C.F.R. § 404.1527(c).  (doc. 20 at 15-16.)

The Commissioner is entrusted to make determinations regarding disability, including evaluating medical opinions and weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Medical opinions are "statements from your physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions. 20 C.F.R. § 404.1527(c)(2). Every medical

---

[11]The Commissioner argues that the ALJ's failure to precisely reiterate all steps of the 8-step medical improvement standard is at most harmless error because substantial evidence supported the ALJ's finding that Plaintiff no longer met the requirements of Listing 11.03. (doc. 21 at 7.)  As found above, however, substantial evidence does not support the ALJ's finding that he no longer met the requirements of Listing 11.03 or that there was medical improvement as of February 8, 2008.

opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*,

209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever

fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted).   Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.   *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, in assessing Plaintiff's RFC during the period at issue, the ALJ did not mention Dr. Figueroa or his opinions at all.   (*See* R. at 934-938.)   She did take into account some of the assessments of Dr. Rutherford, however.   (*See* R. at 936.)   She found that only limited weight should be accorded to Dr. Rutherford's March 5, 2008 opinion that Plaintiff's medical issues precluded him from working on a full-time basis.   (*Id.*)   The ALJ noted that her opinion appeared to be based in large part on functional limitations imposed  by epilepsy, including poor hand-eye coordination, balance difficulties, and migraine headaches.   (*Id.*)   The opinion was given after Plaintiff's surgery, and the ALJ found that the evidence showed that Plaintiff was essentially seizure-free between January 2004 and January 2010.   (*Id.*)   She noted that no neurological abnormalities were shown in June 2007 and December 2012, when he injured his hand and back, respectively.   (*Id.*)   The ALJ did, however, find that Dr. Rutherford's opinion that Plaintiff should avoid strenuous work to be "persuasive and consistent with his medical history."   (R. at 937.)   She noted that Plaintiff required "factor 8" for bleeding and swelling, and found that the combined effects of his hemophilia and morbid obesity would preclude him from performing more than a limited range of sedentary work activity.   (*Id.*)

The Commissioner argues that neither Dr. Figueroa's or  Dr. Rutherford's opinions are medical opinions.   (doc. 21 at 8.)   She contends that Dr. Figueroa did not provide specific

limitations, and Dr. Rutherford did not translate her findings into work-related limitations. (*Id.*)

Only treating physicians' opinions about the nature and severity of an individual's impairments are entitled to controlling weight. *See* 20 C.F.R. § 404.1527(a); SSR 96-2p, 1996 WL 374188 (July 2, 1996). Opinions that a claimant is disabled or opinions on a claimant's ability to work are not entitled to any special significance. 20 C.F.R. § 404.1527. These determinations are legal conclusions reserved for the Commissioner. *Id.*; *Frank. Barnhart.* 326 F.3d 618, 620 (5th Cir. 2003). The ALJ rejected Dr. Figueroa's opinion that Plaintiff's seizures limited his working ability because she neither mentioned it in her decision nor incorporated it into her RFC assessment. His opinion, however, is a legal conclusion reserved for the Commissioner. It also does not address the nature or severity of Plaintiff's epilepsy. The ALJ therefore could properly reject the opinion. *See Jones. v. Colvin*, No. 3:11-cv-2818-BH, 2013 WL 1285486, at *17 (N.D.Tex. Mar. 29, 2013) (finding the ALJ could properly reject the treating phsycian opinion that the plaintiff was unable to work).

Dr. Rutherford qualified as a treating source because she treated Plaintiff and maintained an ongoing relationship with him. *See* 20 C.F.R. § 404.1502; (R. at 461-462, 464, 678, 822.) The ALJ rejected her statement that there will never be a time where Plaintiff is "cured" or well enough to survive without comprehensive coordinated hematological and neurological care", as she neither mentioned it in her decision nor incorporated it into her RFC assessment. It too, however, is a legal conclusion and was properly rejected. Similarly, her opinion that Plaintiff was unable to obtain full-time work, to which the ALJ gave limited weight, was a legal conclusion. *See Jones*, 2013 WL 1285486, at *17.

Dr. Rutherford's opinion regarding Plaintiff's poor hand-eye coordination, balance

difficulties, and migraine headaches, however, was a medical opinion because it related to the nature and severity of Plaintiff's epilepsy and was not conclusory. Because there was no medical evidence from a treating or examining source controverting this opinion, the ALJ was required to perform the six-factor analysis set forth in 20 C.F.R. § 404.1527(c)(1)-(6) before dismissing it. *See Newton*, 209 F.3d at 453-55. The ALJ did not specifically perform that analysis , but only noted inconsistencies between the opinion and progress notes in the record that are not apparent.[12] Notably, the ALJ rejected the opinion because Plaintiff reported that he had no seizures between 2003 and early 2010. Dr. Rutherford acknowledged that despite Plaintiff's reduction in seizures, he still experienced those symptoms. There is no indication that the absence of seizures during that time period would preclude other neurological symptoms such as poor eye-hand coordination, balance difficulties, and migraine headaches. Additionally, the lack of neurological abnormalities noted during an examination for non-neurological issues over a year prior and 3 to 4 years following Dr. Rutherford's opinion would not preclude Plaintiff from having such symptoms at the time Dr. Rutherford gave her opinion or even continuing thereafter. The ALJ's failure to consider all the factors and her failure to present good cause for rejecting Dr. Rutherford's opinion regarding Plaintiff's poor hand-eye coordination, balance difficulties, and migraine headaches was error. *See Newton*, 209 F.3d at 455-58; *see also Loza*, 2019 F.3d at 393 (holding that an "ALJ must consider the record evidence and cannot 'pick and choose' only the evidence that supports his position").

The ALJ's failure to apply the correct standard in considering the Dr. Rutherford's opinion Plaintiff's poor hand-eye coordination, balance difficulties, and migraine headaches was a legal

---

[12]The ALJ actually seemed to address Dr. Rutherford's opinion that Plaintiff was unable to obtain full-time work together with her opinion regarding Plaintiff's poor hand-eye coordination, balance difficulties, and migraine headaches. (*See* R. at 936.)

error, not a procedural error. *See Waters v. Massanari,* No. 4:00–CV–1656–Y, 2001 WL 1143149, at *11 (N.D. Tex. Sept. 24, 2001) (finding that the ALJ had committed legal error when he improperly evaluated the opinions of a treating physician). The Fifth Circuit left the lower courts no discretion to determine whether a legal error is harmless. *Stone v. Heckler*, 752 F.2d 1099, 1106 (5th Cir. 1985) ("Unless the correct standard is used, the claim must be remanded to the Secretary for reconsideration."). Given the ALJ's legal error, this case should be remanded. *See, e.g.*, *Beasley v. Barnhart*, 191 F. App'x 331, 336 (5th Cir. 2006) (per curiam); *Locke v. Massanari*, 285 F. Supp. 2d 784, 404 (S.D. Tex. 2001).[13]

### III.   CONCLUSION

The Commissioner's decision is **AFFIRMED in part and REVERSED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED on this 31st day of March, 2016.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[13]  Because the remaining issue and Plaintiff's argument that the ALJ had a duty to re-contact Dr. Rutherford will likely be resolved upon remand, it is unnecessary to reach that issue and argument

37